846 F.2d 1079
 6 U.S.P.Q.2d 1977
 INTERNATIONAL KENNEL CLUB OF CHICAGO, INC., an Illinois
corporation, Plaintiff- Appellee,
v.
MIGHTY STAR, INC., a New Jersey corporation, and DCN
Industries, Inc., Defendants-Appellants.
 No. 86-2843.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1987.
Decided May 5, 1988.
As Amended July 20, 1988.
 
 Bernard J. Nussbaum, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendants-appellants.
 Jerome H. Torshen, Jerome H. Torshen, Ltd., Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Plaintiff-appellee International Kennel Club of Chicago, Inc. ("IKC"), brought this action against the defendants-appellants Mighty Star, Inc. ("Mighty Star") and DCN Industries, Inc. ("DCN"), alleging that the defendants' use of the plaintiff's "International Kennel Club" name violates section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), as well as state statutory and common law. The district court granted the plaintiff's motion for a preliminary injunction against the defendants' use of the name. The defendants appeal. We affirm in part, reverse in part, and remand.
 
 I.
 
 2
 A. Plaintiff's use of the "International Kennel Club" name
 
 
 3
 The IKC is an Illinois business corporation that sponsors dog shows in Chicago, and is a "show giving member club" of the American Kennel Club ("AKC"), a nationwide organization devoted to furthering the "sport" of showing purebred dogs. In addition to giving dog shows, the IKC serves as an information source for AKC activities in Chicago and provides assistance in the pedigree registration of purebred dogs with the AKC. The IKC also sponsors seminars and contributes funds for animal medical research, the Dog Museum of America, and 4-H programs.
 
 
 4
 The IKC sponsors two major dog shows each year, with the annual spring show having an attendance of between 20,000 to 30,000 people. An average of 1,500 to 2,000 dogs are entered in plaintiff's shows, and for the spring 1986 show, entries came from 36 different states and various Canadian provinces. Persons who attend the plaintiff's shows are often interested in canine-related paraphernalia. While the IKC does not sell such items, private vendors rent booth space at plaintiff's shows at prices ranging from $600 to $800 per booth and sell dog-related items, including stuffed dogs. In 1985 and 1986, the annual revenue from the rental of booth space averaged $60,000.
 
 
 5
 In an effort to promote its activities, the IKC spent approximately $60,000 of its total revenue of $231,226 for fiscal year 1986 to hire a full-time staff person to handle the advertising of the dog shows and public relations. The paid advertising of the IKC, consisting of advertisements in magazines with a nationwide circulation such as the American Kennel Club Gazette and Dog World Magazine, as well as advertisements in the Chicago-area media, is primarily designed to reach canine enthusiasts (the dog "fancy"[1] in trade parlance). The activities of the IKC have also been covered in a variety of national and local publications.[2]
 
 
 6
 B. Defendant's decision to market toy dogs under the name "International Kennel Club"
 
 
 7
 For almost three decades, defendants DCN and its wholly-owned subsidiary Mighty Star have sold stuffed toys in the United States, Canada, England, Australia and Asia. For many years, defendants used the trademark "Polar Puff" to refer to their top of the line products and prominently displayed the trademark on their products and in their advertisements. In the later part of 1985, the defendants decided to add to their product line of stuffed animals a line of stuffed "pedigree" dogs representing different breeds. The defendants state that at the time they had never heard of the plaintiff, and that they chose the name "International Kennel Club" in part because of the international scope of their business, and also because the products were toy dogs. The defendants utilized a marketing strategy whereby purchasers could "register" their dogs with the "International Kennel Club" and receive an "official International Kennel Club membership and pedigree certificate." Part of the defendants' registration strategy was to emphasize that the stuffed canines represent breeds "sanctioned by the International Kennel Club." Although the defendants' International Kennel Club collection of dogs was marketed in conjunction with their "24K Polar Puff" line of toy animals, the advertising for the stuffed dogs did not always use this second name along with the International Kennel Club name. Defendants' instore advertising included plaques, buttons and counter displays, all of which referred to the "International Kennel Club Center," the "International Kennel Club," or the "IKC" without also referring to the defendants' "Polar Puff" trademark.
 
 
 8
 After choosing the IKC name for its line of toy dogs, Mighty Star's counsel conducted a search of trade directories in major cities as well as a search of federally registered trademarks. The search disclosed two telephone directory listings in Chicago--one for "inteRnational kennEl" and one for the "International Kennel Club of Chicago." Nevertheless, counsel advised the defendants that the use of the International Kennel Club name would not infringe upon the plaintiff's name given the local scope of the plaintiff's operations and the fact that the plaintiff did not directly compete with Mighty Star or DCN.[3] Thus, the defendants proceeded to market their line of stuffed dogs under that name without contacting the plaintiff to determine if the use of the International Kennel Club name would present a problem of infringement.
 
 
 9
 C. Evidence of confusion allegedly caused by the marketing of the defendants' toy dogs under the "International Kennel Club" name
 
 
 10
 In late March 1986--six months after learning of the plaintiff's existence--the defendants placed a full-page advertisement for their line of stuffed dogs in the April edition of the Good Housekeeping magazine. This advertisement was followed by ads in the June issues of Better Homes and Gardens, Vogue, and Cosmopolitan magazines that reached the public in mid-May. Following the publication of these ads, IKC officials began receiving telephone calls (at a rate of about one per day), letters, and personal inquiries from people expressing confusion as to the plaintiff's relationship to the International Kennel Club stuffed dogs. Prior to the plaintiff's spring 1986 dog show, the IKC's public relations officer, Ms. Johnson, received telephone calls asking to purchase "International Kennel Club stuffed dogs." Ms. Johnson testified that she thought the callers were referring to the stuffed dogs sold by vendors at the plaintiff's shows, and told the callers that the toy dogs would continue to be sold at the show.
 
 
 11
 The IKC learned of the defendants' line of International Kennel Club toys at the plaintiff's spring dog show on March 29 through 30, 1986. Mr. Auslander, the Secretary and Treasurer of the IKC, testified that a vendor at the show brought one of the defendants' ads to his attention, and asked "why I was involved or why our club was involved in a venture of that type." Thereafter, in early April, the IKC began to receive letters of inquiry concerning the defendants' toy canines. Eight letters requested information on purchasing the dogs, and another from a vendor expressed concern about the IKC's apparent competition.[4] The latter wrote that "[w]e are concerned as vendors that this practice [the plaintiff's apparent selling of toy dogs] conflicts with the stated aims of your involvement as a purebred dog club." The defendants' Executive Vice-President Sheldon Bernstein testified that neither Mighty Star nor DCN received any letters indicating confusion as to their relationship with the plaintiff.
 
 
 12
 After the plaintiff's spring 1986 dog show, Mr. Auslander attended between 15 and 20 other dog shows throughout the country during 1986. Auslander testified that at about half of these shows--including the shows in Florida, Wisconsin, Nebraska, Colorado, Massachusetts, California and Illinois--he was questioned about the relationship between the IKC and Mighty Star's toy dogs. Auslander further recounted that members of the board of directors of the American Kennel Club consulted him, expressing concern that the International Kennel Club might be involved in their sale. According to Auslander's testimony, the President of the American Kennel Club reported to Auslander that it had received questions about whether the toys were a fundraising effort for the Dog Museum of America or the American Kennel Club. Thereafter, at the request of the American Kennel Club, the plaintiff placed an ad disclaiming any relationship to the defendants' toys in the July issue of the American Kennel Club Gazette.
 
 
 13
 D. Plaintiff files suit and moves for a preliminary injunction
 
 
 14
 Confronted with the complaints and inquiries noted above, the IKC filed the instant trademark infringement action on May 23, 1986, and simultaneously filed a motion to preliminarily enjoin Mighty Star and DCN's use of the International Kennel Club name. In response to the lawsuit, the defendants cancelled almost all of their advertising of the products bearing the plaintiff's name. One of the defendants' advertisements--placed in the September issue of Good Housekeeping --used the International Kennel Club name but contained a disclaimer of any relationship to the plaintiff's dog shows. This was the last advertisement that DCN and Mighty Star placed for their line of toy canines.
 
 
 15
 On July 14-16, 1986, the trial court held a hearing on the plaintiff's motion for injunctive relief and on July 21, 1986, ruled from the bench that the plaintiff was entitled to a preliminary injunction. In so ruling, the court found:
 
 
 16
 "I believe that the preliminary injunction in this case which is sought by the plaintiff should be granted. ... it seems to me the thing that the parties should do is this: I think a plan should be worked out between the plaintiff and the defendant under which the defendant is given an opportunity to find a new name in a reasonable period of time, but during--and then to start advertising under its new name, but during the interim that they work out a system where, with disclaimer or otherwise, the defendant can gradually shift over from its present business enterprise and use of the name to some other name without undue disruption of its business. I think the parties in good faith can do that."
 
 
 17
 Despite the court's directions that the parties attempt to work out a plan that would allow the defendant to gradually shift to using a new name for its toy dogs, the parties failed to agree on the terms of such a plan. After a hearing on the terms of the injunction, the court entered an order preliminarily enjoining the defendants' use of the "International Kennel Club" name. Specifically, the order: (1) required defendants to immediately choose a new name which would not be "confusingly similar" to International Kennel Club, but which could have the initials "IKC"; (2) prohibited defendants from placing any more advertising in any North American publication using the name "International Kennel Club" to identify their stuffed dogs; (3) ordered the defendants to withdraw--where possible--unpublished advertising containing the name "International Kennel Club"; and (4) ordered the defendants to begin as soon as commercially practicable, but no later than January 31, 1987, to cease selling stuffed dogs under the "International Kennel Club" name. The order further required the defendants to pay into an escrow account a licensing fee of fifty cents per dog sold under the plaintiff's name subsequent to October 15, 1986 (calculated to be a 3 1/3% royalty). This fund was to serve as a bond for the plaintiff on appeal.
 
 
 18
 Subsequently, the defendants filed a motion to require the plaintiff to post security and to modify and stay the injunction. The court refused to modify the injunction, but stated that to avoid a stay of the injunction order, the plaintiff would have to post a bond pending appeal in addition to the escrow money provided for in the initial injunction. However, when plaintiff's counsel represented to the court that the plaintiff could not afford a bond, the court found that "to force you to post a bond would be basically to destroy your little operation." Consequently, rather than ordering the plaintiff to post a bond, the court granted the defendants' motion to stay the preliminary injunction order pending appeal.
 
 II.
 
 19
 Court of appeals review of a trial court's grant (or denial) of a preliminary injunction is limited to the question of whether the court abused its discretion in granting the requested relief. Curtis v. Thompson, 840 F.2d 1291, 1296 (7th Cir.1988); Roland Machinery Company v. Dresser Industries, Inc., 749 F.2d 380, 384-85, 388-91 (7th Cir.1984); Hyatt Corp. v. Hyatt Legal Services, 736 F.2d 1153, 1156 (7th Cir.), cert. denied, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984). As we discussed in Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1436-38 (7th Cir.1986), our analysis of whether the trial judge abused his discretion entails the application of "mixed" standards: factual determinations are reviewed under the "clearly erroneous" standard, while legal conclusions are reviewed de novo. 782 F.2d at 1437. "But the ultimate weighing and balancing that makes up the decision whether to issue a preliminary injunction is highly discretionary [and is] given substantial deference.... Thus our review is limited to determining 'whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes.' " A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 906 (7th Cir.1986) (quoting Roland Machinery, 749 F.2d at 390).
 
 
 20
 In establishing its entitlement to a preliminary injunction, the IKC bears the burden of demonstrating:
 
 
 21
 "(1) that it has no adequate remedy at law;
 
 
 22
 (2) that it will suffer irreparable harm if the preliminary injunction is not issued;
 
 
 23
 (3) that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;
 
 
 24
 (4) that it has a reasonable likelihood of prevailing on the merits; and
 
 
 25
 (5) that the injunction will not harm the public interest."
 
 
 26
 Brunswick Corp. v. Jones, 784 F.2d 271, 273-74 (7th Cir.1986). We review the district court's analysis of these factors for factual and legal error and rule on the propriety of the court's grant of the injunction in light of the standard of review set forth.
 
 A. Likelihood of success on the merits
 
 27
 In order to prevail in its action under section 43(a) of the Lanham Act, the IKC must establish: (1) that it has a protectible trademark, and (2) a "likelihood of confusion" as to the origin of the defendant's product. A.J. Canfield, 796 F.2d at 906; McGraw-Edison Company v. Walt Disney Productions, 787 F.2d 1163, 1167 (7th Cir.1986). At the preliminary injunction stage, however, a plaintiff need only demonstrate that he or she has a "better than negligible" chance of succeeding on the merits to justify injunctive relief. Curtis, 840 F.2d at 1296; Brunswick Corp., 784 F.2d at 275 ("Although the plaintiff must demonstrate some probability of success on the merits, 'the threshold is low. It is enough that the plaintiff's chances are better than negligible ...' ") (quoting Roland Machinery, 749 F.2d at 387). We therefore analyze not whether the plaintiff will or will not prevail on the merits, but whether the plaintiff has demonstrated a better than negligible chance of establishing the "trademark" and "likelihood of confusion" prongs under section 43(a). Hyatt Corp., 736 F.2d at 1156.[5]
 
 
 28
 The first step in determining whether an unregistered mark or name is entitled to the protection of the trademark laws is to categorize the name according to the nature of the term itself. Trademarks that are fanciful, arbitrary [i.e. made-up terms like "Kodak"] or suggestive are fully protected, while "descriptive words (e.g. "bubbly" champagne) may be trademarked only if they have acquired secondary meaning, that is, only if most consumers have come to think of the word not as descriptive at all but as the name of the product." Blau Plumbing, Inc. v. SOS Fix-It, Inc., 781 F.2d 604, 609 (7th Cir.1986). In Blau, the court explained that:
 
 
 29
 "The goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of head scratching whether a particular brand is that firm's brand or a competitor's brand.... To allow a firm to use as a trademark a generic word, or a descriptive word still understood by the consuming public to describe, would make it difficult for competitors to market their own brands of the same product. Imagine being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words, or an after-shave lotion as 'bracing' because the maker of one brand of after-shave lotion had trademarked this descriptive word."
 
 
 30
 (Emphasis added, citations omitted). Hence, although a term's "primary" meaning is merely descriptive, if through use the public has come to identify the term with a plaintiff's product or service, the words have acquired a "secondary meaning" and would become a protectible trademark. Gimix, Inc. v. J S & A Group, Inc., 699 F.2d 901, 907 (7th Cir.1983); Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 79 (7th Cir.1977), cert. denied, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). In other words, " 'secondary meaning' denotes an association in the mind of the consumer between the trade dress [or name] of a product and a particular producer." Vaughan Manufacturing Co. v. Brikam Intern., Inc., 814 F.2d 346, 348 (7th Cir.1987). We agree with the district court that the phrase "International Kennel Club" fits within the category of descriptive words in that it "specifically describes a characteristic or ingredient of an article [or service]." Miller Brewing Co., 561 F.2d at 79. Thus, the "International Kennel Club" name is entitled to trademark protection only if the name has acquired "secondary meaning," i.e. has become distinctive of the plaintiff's goods and/or services.
 
 
 31
 The defendants claim that the plaintiff's evidence introduced at the preliminary injunction hearing is insufficient to demonstrate that the plaintiff has better than a negligible chance of establishing that the "International Kennel Club" name acquired secondary meaning among the consuming public. "The factors which this court has indicated it will consider on the issue of secondary meaning include '[t]he amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony, and consumer surveys.' " Gimix, Inc., 699 F.2d at 907 (quoting Union Carbide Corp. v. Ever-ready, Inc., 531 F.2d 366, 380 (7th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)). "Consumer testimony and consumer surveys are the only direct evidence on this question ... [t]he other factors are relevant in a more circumstantial fashion." Id. Not surprisingly, the defendants attack the absence of a consumer survey in the evidence produced by the plaintiff at the preliminary injunction hearing.
 
 
 32
 Despite this attack, we are not persuaded that the absence of a consumer survey is per se fatal to the plaintiff's request for a preliminary injunction. As noted previously, the trial court merely granted a preliminary injunction; it did not decide the case on the merits after allowing for full discovery. See Hyatt Corp., 736 F.2d at 1156. The IKC may be in a better position to produce a survey at a full trial on the merits. Thus, while the lack of survey evidence fails to support the plaintiff's request for preliminary relief, we are convinced that it does not necessarily destroy the plaintiff's entitlement to that relief: the existence of a survey is only one of the variety of factors outlined in Gimix as being relevant to the issue of secondary meaning, and the plaintiff may resort to evidence other than a survey in attempting to demonstrate a "better than negligible" chance of establishing secondary meaning. Moreover, Gimix was decided at the summary judgment stage, after the parties had completed their discovery. In contrast, the plaintiff's motion in this case was decided under the time pressures characteristic of preliminary injunction hearings and without the benefit of extensive discovery. For these reasons, the plaintiff's burden at the preliminary injunction stage is slight, and on two separate occasions this court has declined to mandate a consumer survey at this preliminary stage. See A.J. Canfield, 796 F.2d at 908 ("Although Canfield [the plaintiff] did not introduce its own survey, it was not required to do so in order to prevail on a preliminary injunction motion."); Vaughan Manufacturing Co., 814 F.2d at 346.
 
 
 33
 The remaining factors articulated in Gimix as material to the issue of secondary meaning weigh in favor of the trial court's conclusion that the International Kennel Club of Chicago "has acquired a secondary meaning like that among a small but very well-defined group of people in Chicago and elsewhere." In particular, the "amount and manner of advertising" and the "length and manner of use" of the International Kennel Club name yields a better than negligible chance of establishing secondary meaning. With respect to advertising, the plaintiff introduced evidence supporting the inference that the International Kennel Club has developed and maintained its reputation among canine enthusiasts through advertising carefully targeted to reach persons interested in the sport of showing purebred dogs. It has advertised in publications with a continent-wide circulation that are of interest to dog fanciers, including the American Kennel Club Gazette, Kennel Review, and Dog World. And because its shows are held in Chicago, the plaintiff advertises in regional publications of a more general appeal, including the major Chicago newspapers and magazines, as well as various local periodicals. Moreover, the plaintiff mails out as many as 15,000 "premium lists" prior to each show to persons on its mailing lists, and also employs a full-time public relations professional. In its most recent fiscal year, these advertising and public relations expenses have amounted to almost $60,000, or more than 42 percent of the club's total administrative and operating expenses. Viewed another way, these expenses come to more than 25 percent of the club's total revenues; further, the club's activities are often given extensive free publicity. As an example, both major Chicago newspapers have highlighted the plaintiff's dog shows and have designed and promoted special advertising supplements around those columns.
 
 
 34
 As evidence of secondary meaning, the International Kennel Club also introduced evidence that the club received a number and a variety of letters and phone calls asking about the defendants' toy dogs. In A.J. Canfield, the court found similar evidence--letters and phone calls to Canfield "all searching for the elusive diet chocolate fudge drink" (after a competitor advertised its own "Chocolate Fudge" drink)--"sufficient to show that when consumers think of diet chocolate fudge soda they think of Canfield." 796 F.2d at 907. Likewise, the correspondence directed to the plaintiff provides support for the inference that when dog fanciers see the "International Kennel Club" name, they think of the plaintiff. Finally, the plaintiff has operated under and advertised the "International Kennel Club" name continuously for over 50 years. In our view, the club's half-century use of the name, combined with their advertising, substantial free publicity, and wide-ranging activities in support of dog groups, clearly renders the plaintiff's chances of establishing that the International Kennel Club name has acquired secondary meaning better than negligible. See A.J. Canfield, 796 F.2d 907 (Plaintiff's use of the label "chocolate fudge" for 13 years, combined with substantial advertising and free publicity, is sufficient to establish a likelihood of secondary meaning); Vaughan Manufacturing Company, 814 F.2d at 349 (plaintiff's use of its "trade dress" for over 14 years, combined with extensive advertising and evidence of copying, is sufficient to demonstrate a likelihood of secondary meaning).
 
 
 35
 The second element of section 43(a) liability is the existence of a "likelihood of confusion" as to the origin of the defendant's product. McGraw-Edison Co. v. Walt Disney Productions, 787 F.2d 1163, 1167 (7th Cir.1986). "Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties. A variety of factors may be material in assessing the likelihood of confusion." American International Group, Inc. v. London American International Corp., Ltd., 664 F.2d 348, 351 (2d Cir.1981). See also Henri's Food Products Co., Inc. v. Kraft, Inc., 717 F.2d 352, 354 (7th Cir.1983). In determining a likelihood of confusion, this circuit, applying a slightly modified version of Judge Friendly's analysis in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), has considered several factors to be important:
 
 
 36
 "The degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and intent on the part of the alleged infringer to palm off his products as those of another."
 
 
 37
 McGraw-Edison, 787 F.2d at 1167-68 (quoting Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc., 560 F.2d 1325, 1330 (7th Cir.1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978)).
 
 
 38
 "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." Marathon Manufacturing Co. v. Enerlite Products Corp., 767 F.2d 214, 218 (5th Cir.1985). We emphasize that at this preliminary stage in the proceedings, the plaintiff must at a minimum establish that his or her chances of demonstrating a "likelihood of confusion" are better than negligible. With these principles in mind, we turn to an examination of the evidence of confusion introduced at the preliminary injunction hearing.
 
 
 39
 Initially, the plaintiff argues that "[p]erhaps the most blatant evidence of the likelihood of confusion is the fact that the defendants have marketed their pedigree toy dogs under a mark that is not merely similar to plaintiff's name, but is actually indistinguishable from it: The International Kennel Club." (Appellee's Brief at p. 28). The defendants point out, however, that the plaintiff typically uses its full name, "International Kennel Club of Chicago" and that it uses the name in conjunction with a wolfhound head logo. In contrast, the defendants' advertisements display its "24K Polar Puff" house mark along with the International Kennel Club name. The defendants urge that these differences serve to clearly distinguish the parties' marks, thereby undercutting any possible confusion.
 
 
 40
 While DCN and Mighty Star place a great deal of weight on the differences between the marks used by the parties, "this circuit has recognized the rule that if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." Henri's Food Products, 717 F.2d at 356. Particularly where the public does not encounter the marks together, case law holds that it is inappropriate to focus on minor stylistic differences in determining the likelihood of confusion caused by the defendant's use of the allegedly infringing name. See Sun-Fun Products, Inc. v. Suntan Research and Development, Inc., 656 F.2d 186 (5th Cir.1981) ("the inability to compare the [marks] side-by-side and observe the precise difference in appearance may increase the likelihood of confusion.") As this court stated in James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir.1976):
 
 
 41
 "It is of course proper to consider similarities and dissimilarities between the marks in their entireties as one element in determining likelihood of confusion. But the comparison is not that involved in testing for copyright infringement. Though the marks must be compared, they must be compared in light of what occurs in the marketplace, not in the courtroom. Hence it was error below to have evaluated the Distiller's evidence on the basis of judicial comparison of Distiller's label and Restaurant's sign. Side-by-side comparison is not the test.... The consuming public is unlikely ever to be presented with the opportunity for such comparison. As the court said in Colborn v. Puritan Mills [108 F.2d 377 (CA 8 1950) ], ... 'We are to determine ... the purchasing public's state of mind when confronted by somewhat similar trademarks singly presented ...' "
 
 
 42
 (Citations omitted). The only significant difference between the names used by the parties (International Kennel Club of Chicago and the International Kennel Club) is the addition of a common geographic term "of Chicago" (which has frequently been omitted by the plaintiff); under these circumstances, we are convinced beyond doubt that the "similarity" factor weighs in favor of the conclusion that the alleged infringer has appropriated the dominant portion of the mark. See, e.g., Hyatt Corp., 736 F.2d at 1159 (Hyatt Hotels versus Hyatt Legal Services); Lycee Francais de New York v. Reynaud, 143 U.S.P.Q. 311, 311 (N.Y.Supp.1964) ("[t]he fact that plaintiff uses the words 'de New York' after the words 'Lycee Francais' to describe its institution, while defendant uses the word 'Kennedy' thereafter, is of little significance. Both would ordinarily be called ... 'Lycee Francais.' "). See also Metropolitan Opera Association, Inc. v. Metro Opera Association of Chicago, Inc., 81 F.Supp. 127 (N.D.Ill.1948); American Kennel Club v. American Kennel Club of Louisiana, Inc., 216 F.Supp. 267 (E.D.La.1963). DCN and Mighty Star further invite us to infer that the defendants' use of its house mark "24K Polar Puff" in conjunction with the International Kennel Club name on its advertising decreases the likelihood of confusion among consumers. This argument is a smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's name, for even if fanciers of purebred dogs or stuffed toys attached any meaning to the defendants' house mark, they would necessarily believe that the International Kennel Club had licensed, approved or otherwise authorized the defendants' use of the International Kennel Club name. See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 876 (2d Cir.1986) ("While appellant's trade dress may dispel some point of sale confusion engendered by appellant's use of appellee's distinctive trademark, the labeling does nothing to prevent consumers from mistakenly assuming that appellee is somehow associated with appellants or has consented to the mark's use."); A.T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir.1972) ("A purchaser could well think plaintiff had licensed the defendant as a second user and the addition is thus 'an aggravation, and not a justification.' "); A.J. Canfield v. Vess Beverages, Inc., 612 F.Supp. 1081, 1091 (N.D.Ill.1985), aff'd, 796 F.2d 903 (7th Cir.1986) ("Vess's [the defendant's] use of its own Vess house mark in conjunction with chocolate fudge is not a defense to Canfield's infringement claim, for the use of another's trademark constitutes infringement with or without the use of the infringer's house mark."). We conclude that there is more than ample support in the record for the district court's conclusion that the "degree of similarity" between the marks provides some evidence of a likelihood of confusion.
 
 
 43
 The plaintiff next asserts that the likelihood of confusion as to the origin of the defendants' product is increased through the "similarity of the products for which the name is used." McGraw-Edison, 787 F.2d at 1167. But the defendants maintain that the plaintiff, whose business primarily involves the promotion and sponsoring of dog shows, is engaged in a totally different business than the defendants, who merely sell toy stuffed dogs and who use different channels of trade and advertising media. Consequently, the defendants argue that the differences in the parties' businesses weigh against the possibility of consumer confusion. The defendants fail to persuade us that these differences are dispositive: we have specifically noted that a plaintiff need not demonstrate that it is in direct competition with an alleged infringer in order to establish likelihood of confusion. In James Burrough, Ltd., we stated that:
 
 
 44
 "Though, as the district court recognized, trademark infringement must be considered in a marketplace context, the test, likelihood of confusion of consumers, does not require that the contending parties before the court be even in competition. Interested businessmen may sue for trademark infringement in the course of protecting their pocketbook. But it is one of the geniuses of what has been called the 'free enterprise' system (but which, in its proper operation, might be better described as 'consumer-choice' system) that the interests of the consuming public and the entrepreneur are to the maximum extent paralleled. Thus the public need not rely wholly on government for protection against confusion, and need not pay the taxes such reliance would entail."
 
 
 45
 540 F.2d at 275 (emphasis added). See also Professional Golfers Association v. Bankers L.C. Co., 514 F.2d 665, 669 (5th Cir.1975) ("Direct competition is not the sine quo non of trademark infringements; rather the gist of the action lies in the likelihood of confusion to the public.").
 
 
 46
 In the case at hand, the "products" of the litigants, while not identical, certainly cannot be considered as unrelated. As such, it is reasonable to infer the public is likely to be confused as to the source of the defendants' stuffed toys. As the plaintiff properly asserts, it is entirely logical for a dog fancier to believe that a well-known kennel club engaged in various dog-related activities might market or sponsor "pedigree" toy dogs representing "officially sanctioned" breeds. (This is particularly true where the seller of the toy dog informs the customer that he can receive a "pedigree registration certificate" from an entity with the same name as the plaintiff.) In determining the likelihood of confusion that exists due to the similarity between the parties' products, "[t]he question is 'whether the products are the kind the public attributes to a single source.... [T]he rights of an owner of a ... trademark ... extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.' " McGraw-Edison Co., 787 F.2d at 1169 (quoting E. Remy & Martin Co. S.A. v. Shaw-Ross International Imports, Inc., 756 F.2d 1525, 1530 (11th Cir.1985)). Because the parties' products are the kind the public might very well attribute to a single source (the plaintiff), the similarity of the parties' products provides additional evidence of a likelihood of confusion.
 
 
 47
 The plaintiff also introduced evidence of actual consumer confusion at the preliminary injunction hearing. Although the evidence of "actual confusion" introduced at the hearing was, as the district court put it, "hardly overwhelming," "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." World Carpets, Inc. v. Dick Littrells New World Carpets, 438 F.2d 482, 489 (5th Cir.1971) (footnote omitted). Indeed, while likelihood of confusion "can be proven without any evidence of actual confusion, such evidence if available, is entitled to substantial weight." Helene Curtis, 560 F.2d at 1330. Cf. 3A Callman Unfair Competition, Trademarks and Monopolies Sec. 20.06 (4th ed. 1983) ("When equitable relief is sought with due promptness, the use of the defendant's mark will have been of such short duration that even if actual confusion has occurred, proof thereof is virtually unobtainable.... It is therefore accurate to say that in every case, even one in which a preliminary injunction is sought, actual confusion is the best evidence of likelihood of confusion").
 
 
 48
 Hence, plaintiff's evidence of actual confusion--accumulated during the relatively brief period of time between the end of March and mid-June of 1986, when defendants' magazine ads reached the newsstands--is entitled to substantial weight in determining the likelihood of plaintiff's succeeding on the merits. Evidence of actual confusion proffered by the plaintiff consisted of the following: (1) the plaintiff's public relations official (Ms. Johnson) testified that she received calls on an almost daily basis from people who expressed confusion as to the plaintiff's relationship to the defendants' stuffed canines; (2) the plaintiff received eight written requests for information about the defendants' products; (3) the plaintiff's secretary-treasurer testified that he was questioned about the plaintiff's connection to the defendants' toys at dog shows throughout the country; (4) the American Kennel Club indicated that it had been questioned about the plaintiff's relationship to the defendants' product. We agree with the plaintiff's argument that the letters, phone calls, and inquiries received by the plaintiff, as well as the testimony of plaintiff's employees, constitute probative evidence of a likelihood of confusion. Although one district court has broadly ruled that "letters and affidavits from individuals who are not available for cross-examination are generally inadmissible, and hearsay reports with respect to the likelihood of confusion, especially those originating with employees of the plaintiff, are incompetent as evidence," Victory Pipe Craftsmen, Inc. v. Faberage, Inc., 582 F.Supp. 551 (N.D.Ill.1984), we are not convinced that this theory holds true as a general rule for two reasons: (1) in support of its ruling, the district court in Victory Pipe relied exclusively on a treatise that cited case law holding inadmissible the letters and opinions of plaintiff's employees that amounted to mere generalities, conclusions, and/or speculation as to the ultimate legal issue of whether the defendant's product creates a likelihood of confusion, e.g. Model-ETTS Corp. v. Merck & Co., Inc., 118 F.Supp. 259 (S.D.N.Y.1953) (cited in 3A Callman Sec. 20.63 at 394 n. 19) ("while communications from customers can ... be admissible ... to show confusion on the part of the customers who wrote them, ... such matters as are contained in these letters, opinions and extrinsic facts, can [not] properly be presented in an unsworn document."); and (2) the weight of authority allows the admission of letters directed to the plaintiff where the evidence contains factual data (beyond a mere legal conclusion) that is material to the issue of the likelihood of confusion. See, e.g., Union Carbide v. Ever-ready, Inc., 531 F.2d 366, 383-85 (7th Cir.), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (Two letters of complaint about defendant's product held probative of likelihood of confusion); Wells Fargo & Co. v. Wells Fargo Construction Co., 619 F.Supp. 710, 712 (D.Arizona 1985) (Two telephone calls to plaintiff asking for the defendant's number); Counsel of Better Business Bureau v. BBB, 200 U.S.P.Q. 282, 297 (S.D.Fl.1978) (Single letter of complaint assuming a mistake in affiliation between the parties held "convincing evidence that there is a likelihood of confusion.").
 
 
 49
 Because the unsolicited letters received by the plaintiff merely requested information about purchasing the defendants' stuffed toy dogs, the letters are competent factual evidence of confusion on the part of the authors, and were properly considered by the trial court as evidence of a likelihood of confusion.[6] Given the similarities in the parties' marks and their products, the testimony of plaintiff's employees as to the instances of actual confusion, as well as letters indicating actual confusion, we agree with the plaintiff that there is more than ample support in the record for the trial court's finding that the plaintiff demonstrated a better than negligible chance of establishing the "likelihood of confusion" prong under section 43(a).[7]
 
 
 50
 B. Balance of harms and adequate remedy at law
 
 
 51
 According to the defendants, the plaintiff charged, but failed to prove, that the perceived affiliation of its group with the defendants' commercial venture caused damage to its good will and reputation. Conversely, the defendants assert that they incurred real and substantial harm when they invested hundreds of thousands of dollars to advertise their International Kennel Club line of toy dogs. Initially we note that the defendants brought any alleged harm onto themselves through their blatant use of the plaintiff's name in spite of their unequivocal knowledge of plaintiff's prior use of the name. Further, on the plaintiff's side of the balance, the district court properly noted that "part of the damage to the plaintiff I think would come from the fact that members, or if not members, the people who go to the shows and who display the dogs and train the dogs would perceive that the plaintiff is engaged in some sort of a commercial enterprise, which would be anathema to this entire business." As we emphasized in Lawson, the balance of harms aspect of the preliminary injunction standard "is highly discretionary and can only be upset if the judge has abused his or her discretion." A.J. Canfield, 796 F.2d at 908 (citing Lawson, 782 F.2d at 1437).
 
 
 52
 As a factual finding, the district court's determination that if an injunction did not issue the plaintiff would continue to incur damage to its good will and reputation has support in the record and is not clearly erroneous. Although as the defendants point out, the plaintiff failed to establish that people stopped going to the plaintiff's shows or that it lost vendors or advertisers as a result of the defendants' use of the International Kennel Club name, we have never recognized this as the controlling legal standard. To the contrary, we have held that "the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, though no loss in business is shown." James Burrough, Ltd., 540 F.2d at 276 (emphasis added). See also Processed Plastic Co. v. Warner Communications, 675 F.2d 852, 858 (7th Cir.1982) ("[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.").
 
 
 53
 On the defendant's side of the balance, the district court carefully tailored the terms of the injunction so as to minimize and limit the harm to the defendant. For instance, upon the defendant's request, they were allowed to continue selling their inventory of toy dogs under the IKC name through the 1986 Christmas season. Moreover, DCN's president testified that the transition to a new name (the "International Kennel Collection") could be completed by January of '87. There is also nothing in the record to support the defendants' assertion that their advertising will have been "wasted" if the injunction issues. To the contrary, the similarity of the defendants' new name (the "International Kennel Collection") to the International Kennel Club name supports the conclusion that any loss of name recognition of the defendants' products will be slight. Finally, we note that the defendants do not rely exclusively on their International Kennel Club line of stuffed dogs for their economic survival; defendants had total sales in 1985 of approximately $12 million excluding the International Kennel Club line. Any loss associated with their inability to use the International Kennel Club name (rather than using the "International Kennel Collection" name) will not affect the continued success of the company. See A.J. Canfield, 796 F.2d at 909.
 
 
 54
 The defendants also assert that the injunction should not have been issued because the plaintiff has an adequate remedy at law. In fact, the defendants argue, the district court's order requiring them to set aside fifty cents per toy as a "licensing fee" will necessarily ensure that the plaintiff is adequately compensated should the plaintiff prevail on the merits. While we agree that the district court's licensing arrangement provides a small measure of protection for the plaintiff, the court approved the arrangement as much for the defendants' benefit as the plaintiff: its primary purpose was to allow the defendants to unload their inventory of IKC toys without removing all the names on the toys. More importantly, this court has:
 
 
 55
 "[o]ften recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law.... As this court recently explained in Ideal Industries [v. Gardner Bender, Inc., 612 F.2d 1018 (7th Cir.1979) ], this readiness to find irreparable injury arises in part from the realization that 'the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.' ..."
 
 
 56
 Processed Plastic, 675 F.2d at 858 (emphasis added) (citations omitted). We are convinced that the trial court carefully and properly weighed the extent of harm to each party, and we find no error in the court's balancing process. Because the trial judge properly determined that the plaintiff has a better than negligible chance of prevailing on the merits, and that the possibility of the plaintiff incurring irreparable harm is greater than that of the defendants, there is no support in the record for the defendants' allegation that the trial court abused its discretion in granting the requested preliminary relief.[8]
 
 III.
 
 57
 The defendants also challenge the terms and scope of the district court's injunction. Initially, the defendants attempt to hang their hat on their use of a disclaimer in one of their magazine ads, which they argue, if used consistently, would dispel any confusion that may exist as to the origin of the defendants' toy dogs.[9] They urge this court to overturn the trial judge's rejection of their proposal to use the International Kennel Club name in conjunction with such a disclaimer. In fashioning its relief, the district judge stated that "[f]or a while I considered the idea of a disclaimer, which the defendant has actually used, but I, as the plaintiff, agree that it is not workable." While some courts have held that a trial court should adopt less drastic interim remedies than an outright injunction where there is an inadequate showing of irreparable injury due to confusion, see Bell and Howell: Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45-46 (2d Cir.1983), others have rejected the use of a disclaimer as a remedy where, as here, the plaintiffs have demonstrated a likelihood of confusion and resultant harm. See, e.g., Hyatt Corp., 736 F.2d at 1160 (favoring a name change over the use of a disclaimer); Boston Pro Hockey Association v. Dallas Cap & E. Manufacturing, Inc., 510 F.2d 1004, 1013 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), (holding a proposed disclaimer "insufficient to remedy the illegal confusion."); Marquis Whos Who v. North American Ad Associates, 426 F.Supp. 139, 143, n. 5 (D.D.C.1976), aff'd, 574 F.2d 637 (D.C.Cir.1978); Volkswagen Wert Aktingesellschaft v. Karadizian, 170 U.S.P.Q. 565, 567 (C.D.Cal.1971).
 
 
 58
 Additionally, the record reveals that the trial judge considered the use of a disclaimer as a remedy but did not find the proposal workable. For instance, while the defendants selectively used a disclaimer in their magazine advertisements, they failed to do so on the products themselves, the accompanying literature, or in-store advertisements. The defendants also conceded that it would be difficult to ensure the use of disclaimers by their distributors since the defendants had no direct control over the distributors' advertising. Under the circumstances, we refuse to second-guess the court's conclusion that a disclaimer would neither be workable nor effective in eliminating consumer confusion. Especially where the infringement in issue is a verbatim copying of the plaintiff's name, we are convinced that that plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers. As Justice Frankfurter explained over 45 years ago:
 
 
 59
 "The protection of trademarks is the laws' recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a trade-mark exploits this human propensity by making every human effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same--to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress."
 
 
 60
 Mishawaka Rubber and Woolen Manufacturing Co. v. S.S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942).
 
 
 61
 The defendants finally take issue with the geographical scope of the injunction, which extends throughout the North American continent. According to the defendants (1) the plaintiff asserts and can establish no rights extending throughout North America; and (2) there is no evidence that any advertising or sale of the defendants' products in Canada or Mexico has impaired the rights or activities of the plaintiff in the United States. The plaintiff responds that "the evidence clearly demonstrated that the International Kennel Club is entitled to protection of its name in Canada." (Emphasis added). In support of this assertion, the plaintiff notes that it has advertised in continent-wide publications, its activities are covered in the publication Dogs in Canada, and Canadians from various provinces enter dogs in its shows. While there is an adequate basis for affirming a nationwide injunction, we agree with the defendants that the scope of injunctive relief must not exceed the extent of the plaintiff's protectible rights. See Walt-west Enterprises, Inc. v. Gannett Company, Inc., 695 F.2d 1050 (7th Cir.1982). There is some evidence in the record to support extending the injunction into Canada, but little in this record justifies its extension into Mexico at this time. Because the district court failed to adequately consider the proper scope of the injunction, we remand for its consideration of this issue.[10]
 
 
 62
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 CUDAHY, Circuit Judge, dissenting:
 
 63
 This seems to me a strange case of trademark infringement where likelihood of success on the merits and irreparable harm to the plaintiff are both exceedingly unclear. And the majority's rather selective statement of the facts does little to clarify the picture.
 
 
 64
 There is a loss to society in permitting one user to appropriate a descriptive term to the exclusion of others through the establishment of "secondary meaning." See R. Callmann, 3 The Law of Unfair Competition Trademarks and Monopolies Sec. 19.29, at 109 (1983). Courts should therefore be adequately demanding in setting secondary meaning standards before issuing injunctions in aid of such appropriations.
 
 
 65
 In the present case, the majority finds that the plaintiff, "International Kennel Club of Chicago," had "better than a negligible chance"[1] of showing that its name has acquired a secondary meaning by virtue of its use for many years, its advertising of semi-annual dog shows directed to a limited group of dog enthusiasts and its maintenance of a 15,000-person mailing list. The plaintiff spent less than $60,000 on advertising and public relations last year. Here the demands on the plaintiff have been so minimal that in the future almost anything will be susceptible to being claimed under the secondary meaning rubric.
 
 
 66
 The likelihood of confusion is equally uncertain. The plaintiff, a sponsor of live dog shows in Chicago, seeks to enjoin a national manufacturer of stuffed toy dogs. The plaintiff does not manufacture or distribute toy dogs, or goods of any kind. The closest the plaintiff comes to stuffed dogs is to rent booth space at its shows to merchants who may sell them along with a variety of other dog-related items. Thus, although the defendant's mark bears a high degree of similarity to the plaintiff's name, their respective products and services do not compete and are related only by their connection to the broad theme of "dogs." Further, evidence of actual consumer confusion about the origin of the toy dogs is, in the words of the district court, "hardly overwhelming."
 
 
 67
 The plaintiff has not suggested any economic harm it may be suffering as a result of confusion with the defendant's operation. There is no complaint, for example, of diminishing participation, by either dog breeders or vendors, in its dog shows. And evidence of potential harm to its reputation seems to center on a few letters and conversations inquiring into its connection with defendant's sales campaigns. The plaintiff alleges in effect that the inquiries are mildly embarrassing (or perhaps gently demeaning) because they taint it with commercialism. It is surely not clear to me, however, how any real harm is being done. In contrast, the defendant has expended hundreds of thousands of dollars advertising its line of stuffed dogs and thus will suffer considerable economic harm from this injunction.
 
 
 68
 To establish secondary meaning (and the right to appropriate descriptive terms from the public domain) it should be requisite either to show substantial expenditures for advertising--a real investment in the claimed secondary meaning--or actual evidence that consumers associate the descriptive term with the product or service, or both. In lieu of consumer surveys, letters or conversations might be acceptable if genuinely relevant and produced in sufficient volume. Here none of these paths has been followed in any kind of persuasive way. We are thus blazing an uncertain trail, which may allow prior users of the most descriptive of terms to win wide-ranging injunctions with only nominal showings of either harm or confusion. If this case can be a winner, it is difficult to imagine one that could lose.
 
 
 69
 In addition, I do not understand why a disclaimer would not do the job quite satisfactorily here. It is not necessary to crack walnuts with a sledgehammer. Any ill effects on the plaintiff of the defendant's advertising could be remedied by disclaimer. I do not discount the trial court's discretion in these matters, but I am not persuaded it can justify a preliminary injunction (for which no bond has been posted) here.
 
 
 70
 I therefore respectfully dissent.
 
 
 
 [1]
 Webster's Third New International Dictionary defines "fancy" as "persons who pursue or are enthusiastic over some particular art, practice, or amusement: as ... (3): fanciers of animals (the bulldog)."
 
 
 [2]
 For instance, the IKC points to a poll conducted by Kennel Review Magazine, listing the International Kennel Club's show as one of the best in the country. A review of the plaintiff's activities between 1938 and 1984 in Kennel Review Magazine concluded that: "The International Kennel Club, after forty-five years, still remains a show of prestige and education and still follows the original premise--that is to provide a showcase for the best of purebred dogs." The editor of Kennel Review also commented that "[t]he International Kennel Club has long been a prestigious event, but in the last few years it has really put forth effort to become one of the most important events of the year."
 
 
 [3]
 DCN's president testified that he thought "they ... [The International Kennel Club of Chicago, Inc. and the International Kennel] were kennels. So I didn't visualize them to be anything more than that."
 
 
 [4]
 The plaintiff responded to only one of these letters with a form letter approved by Auslander. The letter stated that the International Kennel Club was not affiliated with the toy dogs sold by DCN and Mighty Star and advised the writer that "upon closer look in the ad you saw ... you will see that the 'IKC' information address is 925 Ambody Avenue, Ambody, New Jersey 08861. Hope this information is of assistance to you."
 
 
 [5]
 The dissent characterizes the plaintiff's evidence on these two points as "uncertain" and, as the district court noted, "hardly overwhelming." But legal certainty and/or overwhelming evidence of secondary meaning and actual confusion are not the controlling preliminary injunction standards. Rather, as explained in Brunswick Corp., 784 F.2d at 275, the plaintiff must at a minimum demonstrate that his or her chances of prevailing on the merits are "better than negligible." Id. Once accomplished, the trial judge must determine the degree of the likelihood of success and weigh that likelihood against the remaining factors (including the balance of harms), utilizing the "sliding scale" approach explained in Illinois Psychological Association v. Falk, 818 F.2d 1337, 1340 (7th Cir.1987). The dissent essentially disagrees with the district court's resolution of how the plaintiff's likelihood of success weighs against the balance of harms, which the dissent asserts "seems to favor the plaintiff." But as this court has repeatedly explained, "the ultimate weighing and balancing that makes up the decision whether to issue a preliminary injunction is highly discretionary [and thus the trial judge's determination is] given substantial deference." A.J. Canfield, 796 F.2d at 906. The text of today's opinion demonstrates that not only is plaintiff's likelihood of success much better than the threshold "negligible" level, but also that the balance of harms aspect does not weigh particularly heavy in either party's favor. Thus, we fail to understand the dissent's conclusion that the district court's grant of preliminary relief is so unsupportable as to amount to an abuse of discretion
 
 
 [6]
 The defendants attempt to contrast plaintiff's evidence of actual confusion with the letters they received in response to their national advertising. To the date of the preliminary injunction hearing, the defendants received approximately 4,300 letters, none suggesting that the writer believed there was an affiliation between the defendants' stuffed dogs and the plaintiffs. We question the probative value of this "evidence" because even if the authors of those letters mistakenly assumed that the plaintiff has sponsored or licensed the defendants toy dogs, there would be no reason for the writer to mention this fact in a letter to the defendants whose sole purpose was to request to purchase the toy. Thus, we disagree that the letters received by the defendants in response to their ads can be said to amount to a "survey" of the extent of consumer confusion
 
 
 [7]
 The defendants maintain that two other factors listed by McGraw as bearing on the question of confusion--the weakness of the plaintiff's mark and the defendants' lack of intent to infringe--weigh against plaintiff's evidence of confusion. Even assuming the validity of this assertion, we are convinced that the district court properly weighed these factors into the equation, and the judge's finding that plaintiff had demonstrated a better than negligible chance of establishing a likelihood of confusion is not an abuse of discretion. In addition, because the plaintiff's state law claims for unfair competition and trademark dilution are "absorbed in a finding that trademark infringement ... exists," James Burrough, Ltd., 540 F.2d at 274 n. 16, a discussion of those claims is unnecessary
 
 
 [8]
 We also agree with the plaintiff's contention that the public interest will not be disserved if the injunction issues. In trademark infringement cases, we have stated that "the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interest in not being deceived about the products they purchased." A.J. Canfield, 796 F.2d at 909. Because the district court properly found that there was a likelihood of confusion among the public as to whether the plaintiff sponsored or was otherwise affiliated with the defendants' products, the court adequately assessed the impact of the injunction on the public interest and was well within its discretion in concluding that it would not be disserved
 
 
 [9]
 At oral argument, the defendants maintained that because the letters and calls indicating confusion ceased after defendants' ads with a disclaimer reached the public, there is evidence in the record that their use of disclaimers has in fact remedied any potential confusion. However, as the plaintiff points out, defendants' advertisements containing the disclaimer had not run by the time of the hearing, and it is equally reasonable to assume that the complaints ceased because the defendants halted their advertising of the International Kennel Club line in response to the plaintiff's lawsuit
 
 
 [10]
 The defendants also argue that the trial court erred in failing to require the plaintiff to post security pursuant to Federal Rule of Civil Procedure 65(c), which states in pertinent part:
 "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party enjoined or restrained...."
 Because the trial court stayed the injunction due to the plaintiff's inability to post a sufficient bond, the question of security is not appropriately before the court, and should be addressed to the trial judge at the time a request to lift the stay is properly before the trial court.
 
 
 [1]
 Evidence of irreparable harm to the plaintiff is concededly meager here. The balance of harms even seems to favor the defendant. Hence I question the alacrity with which the majority applies a "better than negligible" standard to the plaintiff's likelihood of success on the merits. A "better than negligible" determination is not a sufficient basis in and of itself for the grant of a preliminary injunction. Rather, such a standard may figure in a sliding scale analysis, in which the balance of harms is the other variable. See Curtis v. Thompson, 840 F.2d 1291, 1296 n. 5 (7th Cir.1988); Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 387 (7th Cir.1984). Once a plaintiff does show a minimal probability of success on the merits, a district court should "determine how likely that success is," for the greater the likelihood of success, "the less heavily need the balance of harms weigh in [the plaintiff's] favor." Id.; Brunswick Corp. v. Jones, 784 F.2d 271, 275 (7th Cir.1986)