**KEYSTONE CONSOLIDATED INDUSTRIAL INC.,**
Plaintiff,

v.

**MID–STATES DISTRIBUTING COMPANY, INC., Blain Supply, Inc. and Oklahoma Steel & Wire Co., Inc., Defendants.**

No. 02–1139.

United States District Court,
C.D. Illinois.

Dec. 3, 2002.

Richard N. Gentry, Jr., Vonachen Lawless Trager & Slevin, F. Louis Behrends, Behrends & Gentry, Peoria, IL, Jon O. Nelson, Joseph J. Berghammer, Helen H. Minsker, Banner & Witcoff, Chicago, IL, for Plaintiff.

David E. Jones, L. Lee Smith, Stephen M. Morris, James Paul-LeFante, Hinshaw & Culbertson, Peoria, IL, Eric O. Haugen, Mark J. Burns, Orrin M. Haugen, Haugen Law Firm PLLP, Minneapolis, MN, Douglas A. Miller, Haynes Studnick Kahan O'Neill & Miller, LLC, F. William McLaughlin, Wood Phillips Katz Clark & Mortimer, Chicago, IL, for Defendants.

## ORDER

MCDADE, Chief Judge.

Before the Court is Plaintiff's Motion for Preliminary Injunction [Doc. # 9]. As this matter arises under § 43(a) of the Lanham Act, 15 U.S.C. § 1114(a)(1), the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court grants Plaintiff's Motion for Preliminary Injunction for the reasons that follow.

## BACKGROUND

Plaintiff Keystone Consolidated Industrial Inc. ("Keystone") is a manufacturer of wire fencing products located in Bartonsville, IL.. Keystone has manufactured wire fencing products since 1889. In 1920, Keystone decided to color the top wire strand of its field fencing products red to distinguish its products from its competitors. In 1954, Keystone extended its color placement scheme by coloring the individual barbs of its barbed wire products red. In 1935, Keystone began using the "King Ranch" mark in connection with wire fencing products.

Keystone obtained incontestable Federal Registrations on the Principal Register for the preceding marks, as set forth in the following table:

| Mark | Registration Number | Goods | Date of First Use | Date of Registration |
|------|--------------------|-------|------------------|---------------------|
| Red band or red-colored portion at top of fencing | 141,481 | Wire fencing in IC 6 | 5/3/1920 | 4/26/1921 |
| KING RANCH | 1,321,770 | Wire fencing in IC 6 | 1935 | 2/26/1985 |
| Red colored barbs attached to metallic colored wires | 622,004 | Barbed wire in IC 6 | 2/22/1954 | 2/28/1956 |
| Color red used on the top margin strand of the goods | 2,004,747 | Metal wire fencing and metal wire panels in IC 6 | 8/12/1991 | 10/8/1996 |

Defendant Midstates Distributing Company, Inc. ("Midstates") is a North Dakota Corporation with its principal place of business in St. Paul, MN.. Midstates is a fifty two member cooperative with members in the United States and Canada.

Defendant Oklahoma Steel & Wire Co. ("Oklahoma Steel") is an Oklahoma corporation with its ·principal place of business in Madill, OK.. Oklahoma Steel manufactures wire fencing products.

Defendant Blain Supply, Inc. ("Blain") is a Wisconsin Corporation with its principal place of business in Janesville, WI. Blain is a retail member of the Midstates' cooperative.

In the fall of 2000, Midstates began a private label wire fencing program. This program featured field wire fencing with a green top wire and barbed wire fencing with green colored barbs. Midstates selected "Ranch King" as its brand name and Oklahoma Steel to manufacture the actual products. In the early part of 2001, Midstates applied for federal registration of its wire fencing marks and "Ranch King" mark in connection with wire fencing products on the Principal Register. The United States Patent and Trademark Office ("PTO") denied Midstates' applications. Thereafter, Midstates applied for registration on the Supplemental Registry for all three marks. At the time of the Preliminary Injunction hearing, the PTO had granted registration of the green barbed barb wire mark on the Supplemental Registry, with the green top wire mark still pending.

After learning of Midstates' marks, Keystone filed the instant suit alleging trademark infringement, trademark dilution and unfair competition. In conjunction with its claims, Keystone filed the instant Motion for Preliminary Injunction that was the subject of a three day hearing.

### LEGAL STANDARD

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of success on the merits and (2) that it has no adequate remedy at law and will suffer irreparable harm if the injunction is denied. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114–15 (7th Cir.1997). If a plaintiff fails to establish either of these elements, then a court's analysis "ends and the preliminary injunction should not be issued." *Adams v. City of Chicago*, 135 F.3d 1150,

1154 (7th Cir.1998). If, however, the plaintiff clears both thresholds, "the court must next consider (3) the irreparable harm the non-movant will suffer if the injunction is granted balanced against the irreparable harm to the movant if relief is denied, and (4) the effect granting or denying the injunction will have on non-parties." *Meridian,* 128 F.3d at 1114. The Court then weighs the four factors in deciding whether to grant the injunction. *See Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). The Seventh Circuit has portrayed the proper weighing process as a "sliding scale" approach, that is, "the stronger the case on the merits, the less irreparable harm must be shown." *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1172 (7th Cir.1997) (citations omitted). "The balancing of imponderables involved in the decision whether to grant or deny a preliminary injunction is a task calling for a judgment based on the particulars of the individual case." *Planned Parenthood of Wis. v. Doyle,* 162 F.3d 463, 465 (7th Cir. 1998).

## ANALYSIS

### I. Keystone has shown that it is likely to succeed on the merits of its trademark infringement claims.

■ Under § 43(a) of the Lanham Act, Keystone must establish: (1) that it has protectable trademarks; and (2) a "likelihood of confusion" exists as to the origin of the Mid–states' products. *See* 15 U.S.C. § 1114(1)(a); 15 U.S.C. § 1125(a); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986). At the preliminary injunction stage, however, Keystone need only show that it has a "better than negligible" chance of succeeding on the merits to justify injunctive relief. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988).

### A. Keystone has shown that it has a Protectable Trademark

Keystone owns registrations in the Principal Register for the red top-wire strand trademark used on its field fencing products and the red barbed trademark used on its barbed wire products. In addition, Keystone possesses a registration for the "King Ranch" word mark in the Principal Register used on its fencing products. These registrations are "prima facie evidence of the validity of the registered mark" and of Keystone's exclusive right to use these registered marks in connection with its wire fencing products. 15 U.S.C. § 1115(a).

■ Mid–states has asserted the defense of functionality to Keystone's red top wire strand and red barb barbed wire marks. A brand's shape, color, pattern, or other design characteristic cannot claim trademark protection if it is "functional." Thus, the Court must resolve whether the placement of color on the top wire strand of field fencing and on the individual barbs of its barbed wire fencing products is functional. The Court finds that Mid–states has failed to carry its burden in proving that the preceding two marks are functional.

"[T]he concept of functionality is intended to screen out from the protection of trademark law certain design features even if they have become so far identified with the manufacturer of a particular brand that consumers may be confused about the origin of the good if another producer is allowed to adopt the feature. The reason for this screen or filter becomes apparent once the purpose of trademark protection is understood. The purpose is to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so that they want to keep buying the prod-

uct (or buying from the producer), or bad experiences, so that they want to avoid the product or the producer in the future. This purpose is achieved by letting a producer pick an identifying name or symbol for his brand, and forbidding competing producers to use the same name or symbol on their brands. Since the supply of distinctive names and symbols is very large, indeed, for all practical purposes infinite, competition is not impaired by giving each manufacturer a perpetual 'monopoly' of his identifying mark; such marks are not a scarce input into the production of goods. But if instead of picking a distinctive mark for his brand, a manufacturer tries to appropriate the word that consumers use to describe the entire product (comprising his brand plus all competing brands)—for example, tries to use 'automobile' as his trademark, rather than 'Chevrolet'—then he is trying to monopolize a scarce input, for there usually are only one or two works in common usage to describe a given product (such as 'car' and 'automobile'). In such a case, trademark protection will be denied. In the language of trademark lawyers, 'generic' names may not be trademarked.

The same principle applies if the trademark is part of the design of the product (its shape, pattern, etc.) rather than a word or logo affixed to the product. If the feature is ornamental, fanciful, decorative, like the patterns on a piece of china or of silverware, then the manufacturer can use it as his name, his symbol, his identifying mark. Ornamental, fanciful shapes and patterns are not in short supply, so appropriating one of them to serve as an identifying mark does not take away from any competitor something he needs in order to make a competing brand. But if the feature is not ornamental or fanciful or whimsical or arbitrary, but is somehow intrinsic to the entire product consisting of this manufacturer's brand and his rivals' brands, trademark protection will be denied. The name of this principle is 'functionality,' . . . ."

*W.T. Rogers Company, Inc. v. Keene,* 778 F.2d 334, (7th Cir.1985). "[A] feature is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 33, 121 S.Ct. 1255, 1262, 149 L.Ed.2d 164 (2001). A person seeking to enjoin others from using such features must instead seek protection under patent law, where protection from copying is more comprehensive but for a shorter duration than trademark law[1].

Keystone has registered trademark protection for the addition of the color red to the top wire strand of its field fencing products and the individual barbs of its barbed wire products. Thus, the addition of the color to certain specific portions of fencing products is the feature that Keystone is attempting to enjoin other competitors from using under trademark law. In evaluating whether this feature is function-

---

**1.** "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or function for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity)." *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 164–65, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

al or a legitimate trademark, the Court must determine the effect, if any, this feature has on the *de facto* purpose of Keytone's field fencing products. *See W.T. Rogers Company, Inc.* 778 F.2d at 339 (quoting *In re Bose Corp.,* 772 F.2d 866, 872 (Fed.Cir.1985)) ("If the feature asserted to give the product is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered."). Field fencing is used to either retain objects or creatures within a set area or prevent entry of creatures into said area. It is clear to the Court that the addition of color does nothing to enhance the efficacy of Keystone's wire fencing in this regard [2].

Accordingly, the Court regards the addition of color to be a feature that is ornamental and decorative rather than one that is essential to the use or purpose of wire fencing products [3]. In *W.T. Rogers,* the Seventh Circuit gave several examples of features that were functional and features that were not. In the context of an automobile, the Seventh Circuit stated that a hood was a functional feature and that a hood ornament was not. All cars require hoods to protect their delicate engine components from the elements and lower the aerodynamic co-efficiency of the product to increase gas mileage. Hood ornaments

are not in that they do not affect the de facto purpose of a car in any way. Whether or not a manufacturer uses a hood ornament has no bearing on the efficacy of a car. In this regard, the Court finds that Keystone's marks are like the hood ornament on a car rather than the hood. Since the addition of color has no impact on the efficacy of wire fencing, it is not a feature that Keystone's competitors need to design around to produce viable competing products. *See id.* It therefore follows that Keystone's trademarks do not hinder effective competition in this specific market arena. Along these lines, there is evidence in the record that shows that Mid–state stores did not suffer any significant falloff in sales after switching from Mid–states' green top wire and green barbed wire fencing to plain, non-colored wire fencing. This compels the conclusion that the addition of color to the top wire strand of field fencing and the individual barbs of barbed wire is not necessary to compete effectively in the marketplace.

Mid–states claims that the addition of color to the top wire strand of field fencing and the barbs to barbed wire fencing is the most cost-efficient method of adding color to wire products. Any other placement, Mid–states contends, will add to the cost of

**2.** Mid–states contends that the addition of color to the top wire strand is functional in that it helps distinguish the top from the bottom, thereby aiding installation of the fencing. While *Keystone's* field wire fencing mark may or may not ease installation of said product, that benefit of the color placement feature is one that is incidental to the mark. It is not one that is "essential to the use or purpose" of field wire fencing. *See TrafFix Devices, Inc.,* 532 U.S. at 33, 121 S.Ct. 1255.

**3.** Mid–states cites the case of *In re Pollak Steel Company,* 50 C.C.P.A. 1045, 314 F.2d 566 (Cust. & Pat.App.1963) to support its contention that Keystone's red top wire mark is functional. While the facts of this case are similar at first blush, a closer examination of

the facts show that it is factually inapposite to the instant case. *Pollak* involved a trademark application for steel fence posts with a colored stripe at the top of the post. The denial of this application was upheld by the United States Court of Customs and Patent Appeals on the grounds of functionality. *Id.* at 570. Specifically, the plaintiff attempted to trademark the application of reflective paint to the top of the steel post. However, the reflective paint aided the visibility of the post for safety and protection purposes, rendering its usage on the post functional. *Id.* at 569. Finally, the placement of color at the top of the post was a practice common in the industry in signifying the source of a particular post. *Id.* at 568.

producing colored wire fencing products. This being the case, Mid–states maintains that Keystone's wire fencing marks are functional. It appears to the Court that Mid–states is hanging its hat on the following language of the Supreme Court in *TrafFix*: "a feature is also functional ... when it affects the cost or quality of the device." *TrafFix Devices, Inc.*, 532 U.S. at 33, 121 S.Ct. 1255. And it is true that Mr. Richards testified that the addition of color in certain volumes would add to the manufacturing costs of the wire fencing products. However, it does not therefore follow that Keystone's marks are automatically functional. As the Court has concluded *supra*, the placement of color on wire products is a dispensable feature. Therefore, Keystone's competitors do not need to expend money to design around it to produce wire fencing products of equal efficacy. Accordingly, it is not a feature that would be costly to do without rather than costly to have. *See W.T. Rogers Company, Inc.* 778 F.2d at 339. Nor is there any evidence that color placement effects the quality of said products. It therefore follows that the color placement feature of Keystone's wire fencing marks is not functional.

Mid–states has also elucidated a host of other reasons it believes Keystone's marks are functional: i.e. Keystone's color placement is the most visible to potential purchaser's at the point of sale, and that it is the most visible to potential consumers post sale in actual use in the field-thereby "acting as a constant advertisement for Keystone's Red Brand Fencing." (Mid–states' Post Hearing Brief, p. 3). The Court finds Mid–states' arguments to once again miss the point. The fact that Keystone's exclusive use of its trademark places Mid–states at a significant disadvantage from a marketing viewpoint does not mean that Keystone's marks are functional. Rather, it means that Keystone's marks serve to identify the source of said products pre and post sale. As the Lanham Act and relevant caselaw make abundantly clear, source identification is the very purpose of trademark law. It is only when the exclusive use of a feature puts competitors at a "significant *non-reputation-related* disadvantage" does a feature become functional and cannot serve as a trademark. *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300. Following Mid–states' own arguments, it is clear to the Court that such is not the case here.

A thornier issue for the Court to consider is whether Keystone's wire fencing marks are functional from an aesthetic perspective. Put another way, the issue is whether the consuming public finds Keystone's red colored top wire and red marks to be pleasing to the point where it is "so important to the value of the product to consumers that continued trademark protection would deprive them of competitive alternatives...." *Id.* at 347. Thus, Mid–states carries the heavy burden of showing that the use of Keystone's marks is so attractive that maintaining its trademark registrations would deprive consumers of effective competitive alternatives. *See Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1191 (7th Cir.1989).

During the hearing, Keystone introduced evidence that alternate designs existed that were available to Mid–states, such as coloring the second to top strand, stenciling, coloring the entire product, etc., that would lead to the conclusion that copying Keystone's color placement design was not necessary for effective competition. While Mid–states did introduce some testimony from Mr. Richards on the fencing manufacturing process, there is nothing in the record as to the costs of implementing any of the proposed alternate designs vis-a-vis Keystone's designs. Consequently, the Court cannot determine at this juncture whether the costs of imple-

menting these alternative designs would bar Keystone's competitors from competing effectively in the marketplace. *See, e.g., Schwinn Bicycle Co.*, 870 F.2d at 1191 ("The fact that Ross failed to introduce cost studies may very well be determinative of whether Ross has sustained its burden on the question of functionality...."). Although the Court can certainly imagine circumstances where implementing certain designs would make low margin fencing products prohibitively expensive, Mid–states has failed to introduce any cost studies to substantiate its claims of functionality. The Court also notes that Mid–states' amendments to its green barb barbed wire mark and green top wire field fencing mark specifically claim that the marks in question are not functional[4]. (Plaintiff's Exhibits 98 and 100).

**B. Keystone has shown that there is a likelihood of confusion if Mid–states is allowed to maintain its marks.**

 In order to succeed on its trademark infringement claims, Keystone must show that there is a likelihood that consumers will confuse Mid–states' competing marks with its own. When evaluating whether a likelihood of confusion exists, it is a well established that "[a] variety of factors may be material in assessing the likelihood of confusion" and that "[n]one of these factors by itself is dispositive of the likelihood of confusion question." *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th Cir. 1986) (citations omitted). The Seventh Circuit has set forth the following seven factors in determining the likelihood of confusion:

(1) similarity between the marks in appearance and suggestion;

(2) similarity of products;

(3) area and manner of concurrent use;

(4) degree of care likely to be exercised by consumers;

(5) strength of complainant's mark;

(6) actual confusion; and,

(7) intent of defendant to 'palm off his product as that of another.'

*Smith Fiberglass Prods. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1087 (7th Cir. 1988). These factors are not a mechanical checklist, and "[t]he proper weight given to each ... will vary from case to case." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir.2000) (quoting *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 381 (7th Cir.1996)). The test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected. *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1228–29 (7th Cir. 1993). In determining whether to grant a preliminary injunction, the Court must weight the evidence pertaining to each likelihood of confusion factor and balance the seven factors against each other. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir.2000). When the Court evaluates the likelihood of confusion, "the actual and reasoned weighing of the evidence is imperative and is inherent in a meaningful exercise of discretion[,]" *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*,

---

**4.** It is perplexing to the Court, to say the least, that Mid–states' has a assumed a Janus-like position on the functionality of color placement, having expressly disavowed this claim before the PTO in its Supplemental Registry applications. In any event, Mid–states' pleadings before the PTO clearly indicate that it did not believe that Keystone's color placement was functional.

870 F.2d 1176, 1184 (7th Cir.1989), as is the explicit balancing of the test's factors. *See Barbecue Marx, Inc.*, 235 F.3d at 1044.

## 1. Similarity of Marks

■ It is clear from the evidence presented at the hearing that the field fencing and barbed wire marks are identical but for color; red for Keystone, green for Mid–states. In this regard, Mid–states has relied on the differences between the two primary colors as being dispositive on the issue of trademark similarity. As Mid-states' counsel correctly points out, red is indeed different from green. Had Keystone's marks consisted solely of the application of color on its field fencing and barbed wire fencing products, the Court would concur with Mid–states and hold that the marks are dissimilar. However, Keystone's marks consist of more than just color. Keystone's marks consist of the color red applied to a *specific location* on its products-the ten gauge top wire strand of its field fencing and the individual barbs of its barbed wire fencing. The Court finds that it is the placement of this color, and not the actual color itself, that is the salient feature of Keystone's marks. While Mid–states' marks are distinctly different in color, the Court reiterates its earlier observation that the location of that color is identical to Keystone's marks. "If one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *International Kennel Club*, 846 F.2d at 1087–88 (citing *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir.1983)); *see also Ty, Inc. v. The Jones Group*, 98 F.Supp.2d 988, 999 (N.D.Ill.2000) (finding that defendant's "BEANIE RACERS" mark similar to Ty's "BEANIE" mark); *Meridian*, 128

F.3d at 1116 (the word "Meridian" was the critical element both company's names, and trademark was deemed essentially the same). Having rejected Mid–states' claims that the placement of color is functional, *infra*, the Court finds that the strong similarity of the marks heavily weighs in favor of finding a likelihood of confusion.

## 2. Similarity of Products

The next step in the Court's analysis focuses on the similarity of products Keystone and Mid–states' marks are used on. In determining the likelihood of confusion that exists due to the similarity between the parties' products, "[t]he question is 'whether products are the kind that the public attributes to a single source.... [T]he rights of an owner of a ... trademark extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.'" *McGraw–Edison Co.*, 787 F.2d at 1169 (quoting *E. Remy Martin & Co. S.A. v. Shaw–Ross International Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985)). The products on which Keystone and Mid–states use their respective marks are more than merely related, they are identical. While there are some minor variations between the actual products [5] offered by each party; the actual product types are identical. This strongly supports an inference that consumer confusion is likely.

## 3. Area and Manner of Concurrent Use

This factor examines "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of North Am. v. Forum Ltd.*, 903 F.2d 434, 442 (7th Cir.1990). In determining whether the

**5.** Specifically, Richards testified that Oklahoma Steel had never manufactured any green top wire wire fencing that was 60' in height, whereas Keystone had offered 60' high red top wire wire fencing. There was also some testimony that Keystone and Mid-states sold barbed wire in different lengths.

area and manner of concurrent use as between the two marks is likely to cause confusion, cases have tended to focus on the "geographical area of distribution, whether there is evidence of direct competition between the relevant products, whether the products are sold in the same stores, whether the products are sold in the same section of a given store, whether the products are sold through the same 'marketing channel.'" *Ty, Inc.,* 98 F.Supp.2d at 999 (quoting *S.Industries, Inc. v. JL Audio, Inc.,* 29 F.Supp.2d 878, 891–92 (N.D.Ill.1998)). The sale of Mid-states' products overlap with the sale of Keystone's products geographically. This should come as no surprise given that Mid-states' developed its house brand fencing program to supplant or replace Keystone as the supplier of wire fencing products to its member stores. While Mid-states' products are not offered for sale at any competing retailers, it is significant that members of its cooperative are still free to purchase wire fencing from either Keystone or Mid-states. Accordingly, the Court finds that the concurrent use of the products demonstrates a likelihood of confusion.

### 4. Degree of Care Likely to be Exercised by Consumers

The degree of care factor seeks to distinguish how likely the relevant group of consumers is to distinguish between different products. *S Industries,* 29 F.Supp.2d at 892. Where the relevant group of customers is likely to buy in haste or on impulse, confusion is more likely. *See id.* Additionally, "where 'the cost of the . . . trademarked product is high, the courts assume that purchasers are likely to be more discriminating than they might otherwise be.' Moreover . . . where the product involved was a low value item, the risk of confusion is greater . . . ." *Id.* (quoting *Maxim's Ltd. v. Badonsky,* 772 F.2d 388, 393 (7th Cir.1985)). During the course of the hearing, both parties introduced testimony that indicated that the there were several distinct categories of potential customers for wiring fencing products. The first category consists of farmers and ranchers, who are more likely to be knowledgeable of their needs and the relevant products. The other group consists of "hobby" farmers and ranchers, who are less knowledgeable. Regardless of the purchaser, it does not seem that wire fencing falls into the category of products that are the subject of impulse purchases. Testimony adduced during the hearing indicated that fencing purchasing decisions are usually made as a part of a project. In addition, the evidence presented at the hearing shows the rolls of fencing are priced in the vicinity of $100.00. This leads to the conclusion that some consumers are more likely to display a greater degree of care and attention to their purchases. Accordingly, this factor weighs somewhat against the likelihood of confusion.

### 5. Strength of Keystone's Marks

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir.2000) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir.1992)). "Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related." *Sands, Taylor & Wood,* 978 F.2d at 959 (quoting 1 McCarthy, *supra* § 11;24 at 505–06). Keystone has used its red top wire mark continuously since 1920, its red barbed barb wire mark since 1954 and its "King Ranch" mark since 1935. Since 1990, Keystone has expended over $20 million in advertising using its marks. Key-

stone has sold over $100 million of its red top wire field fencing products and over $45 million of its red barbed barb wire fencing products in the past three years, in addition to $1.5 million of its "King Ranch" wire products. Accordingly, this factor weighs in favor of Keystone.

### 6. Actual Confusion

"While proof of actual confusion is not required to prove likelihood of confusion, 'courts often view evidence of actual confusion as the best evidence of likelihood of confusion.'" *Knaack Manufacturing Co. v. Rally Accessories*, 955 F.Supp. 991, 1001 (N.D.Ill.1997) (quoting *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 383 (7th Cir.1976)). However, "isolated instances of actual confusion or misdirected mail have been held insufficient to sustain a finding of likelihood of confusion." *Id.* at 383. "De minimis evidence of actual confusion does not necessarily establish a likelihood of consumer confusion." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir.1998).

In the instant case, Keystone has presented the Court with expert testimony of a survey sent out in an issue of Progressive Farmer. According to the results of this survey, approximately fifteen percent of the respondents believed that field wiring fencing with a green top wire was made by Keystone. Accordingly, the expert testified that he believed a likelihood of confusion existed. While he conceded that there were flaws present in the way the survey was conducted, he testified that the presence of those flaws diluted the results, thereby understating the likelihood of confusion. In addition, Keystone produced several unsolicited emails inquiring whether it had changed its brand name from "Red Brand" barbed wire to "Ranch King" barbed wire. (Plaintiff's Exhibits 24, 215). Other examples of confusion presented at the hearing included evidence that displays bearing Keystone's products in connection with Mid–states' products, (Plaintiff's Exhibits 2, 3, 30–32, 74, 195, 197, 207–209, 211, 214, 218, 225), or the reverse. (Plaintiff's Exhibits 110, 202–206). Again, this factor weighs in favor of Keystone.

### 7. Intent to Palm Off Products as that of Another

The final factor the Court must weigh in determining the likelihood of confusion is Mid–states' intent in terms of its marks and products. In order to find trademark infringement, it is not necessary to find proof of the infringer's fraudulent intent. *See Ziebart International Corp. v. After Market Assoc.*, 802 F.2d 220, 227 (7th Cir. 1986).

Keystone's argument for intent can be summed up by the following narrative. During the year 2000, several members of the Mid–states cooperative expressed dissatisfaction regarding their distribution arrangements with Keystone. At that time, some members of the Mid–states' cooperative had the option of sourcing Keystone's fencing products either directly or indirectly through a distributor. This option did not exist for members of Mid–states' "Western Group." Western Group members were required to purchase Keystone products from Keystone's distributor in the western United States, Hutchison and Western. Western Group members felt that this arrangement placed them at a competitive disadvantage with their competitors and approached Keystone with a proposal to remove Hutchison and West as a middleman and deal directly with Keystone. Keystone rebuffed them.

In late October, 2000, Mid–states' five person fencing committee convened a meeting in Las Vegas, Nevada to discuss establishing a private label fencing program that would compete with Keystone's

products. Present at that meeting were several of Keystone's competitors, including Oklahoma Steel and Wire. While Hutchison and West was present, Keystone was notably absent. After the October, 2000 meeting, Mid–states' fencing committee prepared a presentation that outlined its private label fencing program during November, 2000. This presentation highlighted the volatility of the wire fencing market and emphasized Mid–states' need to develop a private label fencing program. (Plaintiff's Exhibit 8). The presentation also showed that Mid–states' fencing program had already settled on Oklahoma Steel and Wire as the manufacturer and had decided that its products would feature a colored top wire strand and colored barbs. (Plaintiff's Exhibit 8). No specific color was given. (Plaintiff's Exhibit 8). In addition, the presentation set forth "Ranch King" as the brand name of the private label program. (Plaintiff's Exhibit 8).

On November 17, 2000, Thomas Orr ("Orr"), Mid–states' General Merchandise Manager, set out a memorandum to all Mid–states' members detailing its private label fencing program. In the memorandum, Orr identified Keystone's distribution arrangements and concerns about Keystone's financial conditions as the "challenge" facing the members of its cooperative. (Plaintiff's Exhibit 12). In response, Orr wrote that "[t]he timing is right to play offense and partner with a vendor who recognizes our [Mid–states'] market presence and growth potential." (Plaintiff's Exhibit 12). Restating the details in the November presentation, Orr stated that "Ranch King"[6] would be the brand name for a line of fencing products that would have a colored top strand and colored barbs. (Plaintiff's Exhibit 12). Once again, a specific color was not mentioned. (Plaintiff's Exhibit 12). Eric Wolander ("Wolander"), Mid–states' Chief Operating Officer, Steven Tyrholm ("Tyrholm"), a member of Mid–states' fencing committee, and Orr all testified that they were aware of Keystone's mark prior to the October, 2000 meeting and that none of them were aware of any fencing products beside Keystone's that featured a colored top wire strand or colored barbs.

Based on the preceding narrative, Keystone alleges that its refusal to redo its distribution relationship with Mid–states' provided the impetus for Mid–states' private label program. Keystone further argues that Mid–states' decision to use color on the top wire strand and barbs provides further evidence of Mid–states' intent to palm its goods off as Keystone's, especially in light of the fact that the Orr memorandum and November, 2000 presentation fail to mention any specific color. This failure to indicate color provides further evidence that Mid–states considered placement, which is the distinguishing feature of Keystone's marks, to be more important than the actual color itself. In addition, Keystone believes that the selection of "Ranch King" as the brand name buttresses its claim of bad faith in that it is similar to Keystone's "King Ranch" mark[7]. Keystone concludes from the aforementioned

---

6. While Mid–states claims that it has used the "Ranch King" mark for over thirty years and owns registrations for it, the record discloses that the mark has only been registered for lawn tractor products and had never been used in conjunction with wire fencing products until the October, 2000 Las Vegas meeting.

7. Mid–states has stated that it discontinued use of the "Ranch King" mark in May, 2002 in favor of the "Ranch Premium" mark. Keystone does not contest Mid–states' right to use the "Ranch Premium" mark on its products. Nonetheless, the Court finds that the "Ranch King" mark is still relevant in considering Mid–states' intent at the time it created its private label program.

unusual similarity between the marks and the fact that the program had an unusually short gestation period of a few weeks that Mid–states intended to trade off Keystone's marks.

The Court finds the preceding narrative to be persuasive and is not convinced by Mid–states' arguments to the contrary. Mid–states' representatives uniformly acknowledged that they all had knowledge of Keystone's marks prior to commencing their private label program. Wolander, Orr and Tyrholm testified that the private label program was designed to distinguish their products from Keystones through their choice of color. However, the Court finds this assertion to lack credibility given the evidence in the record conclusively showing that the color placement was of foremost importance and that the actual color chosen was almost an afterthought.

In addition, the "Ranch King" labels affixed to the finished products are silent as to the manufacturer or source of the goods. (Plaintiff's Exhibits 26 and 27). An earlier mockup of the label includes the phrase "Manufactured Exclusively for Mid States Distribution," that was removed from the final version. (Plaintiff's Exhibit 170). Mid–states has entered into the record several Big R sales flyers that introduce the "Ranch King" brand of products. (Plaintiff's Exhibit 114 and Defendant's Exhibit 14). The existence of a comparative advertisement in these flyers, Mid-states maintains, is a evidence of lack of intent. Upon closer examination, however, the Court notes that no specific competing products or producers are mentioned. Nor is there any mention of the source or manufacturer of the "Ranch King" products. Had these comparative advertisements identified Keystone's "Red Brand" products and mentioned the source of the "Ranch King" products in any way, the Court would be willing to give more credence to Mid–states' claims of lack of intent.

Finally, the record shows that Mid-states' green top wire mark application was rejected by the PTO on January 31, 2002 as being likely to cause consumer confusion[8]. (Plaintiff's Exhibit 17). Despite this rejection, Mid–states continued to use this mark. Accordingly, the Court finds that the intent factor weighs in favor of finding a likelihood of confusion.

---

**8.** In the supplemental pleadings filed prior to the evidentiary hearing, Mid–states produced a registration for the green barb barbed wire mark. (Defendant's Exhibit 19). On the basis of this registration, Mid–states argued that it had a conclusive determination from an expert PTO examiner that its use of the green barb barbed wire mark was not likely to cause consumer confusion and strongly urged the Court to defer to the PTO's decision. However, Mid–states' brief failed to disclose that this registration was not in the Principal Register, but in the Supplemental Register.

To be registrable on the Supplemental Register, a designation must be "capable of distinguishing applicant's goods . . . ." *In re Crown Zellerbach Corp.*, 1985 WL 72042, 229 U.S.P.Q. 318, 319 (Trademark Tr. & App. Bd.1985) (quoting Section 23 of the Trademark Act). "Whether in fact a designation does distinguish the goods or services of an applicant from those of others is unnecessary to consider for purposes of the Supplemental Register." *Id.* (citing J.McCarthy, Trademarks and Unfair Competition, § 19:8 (1973)). "It is overwhelmingly agreed that a Supplemental Register registration is evidence of nothing more than the fact that the registration issued on the date printed thereon. It is entitled to no presumptions of validity, ownership, use or priority." *In re Federated Department Stores Inc.*, 1987 WL 124292, 3 U.S.P.Q.2d 1541, 1543 (Trademark Tr. & App. Bd.1987) (Citations omitted). Given the prevailing authority, the Court declines to give the green barb barbed wire registration in the Supplemental Registry any more weight than it is properly due. While the Court presumes that counsel was negligent in overlooking the distinction between registrations in the Principal and Supplemental Registers, the Court finds Mid–states' arguments in this regard to be disingenuous and misleading, to say the least.

### 8. Conclusion

"None of the factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *International Kennel Club*, 846 F.2d at 1086. Having considered and weighed all of the factors against each other, the Court finds that Keystone has a better than negligible chance of succeeding on the merits.

In reaching this conclusion, the Court acknowledges the Seventh Circuit's ruling in *Libman Company v. Vining Industries, Inc.*, 69 F.3d 1360 (7th Cir.1995). Despite the superficial similarities of *Libman* to the instant case, the Court finds *Libman* to be factually distinguishable from the matter at hand.

The plaintiff in *Libman* was a manufacturer of brooms who owned a trademark for a broom with a randomly colored stripe in the bristles. The defendant was a competing manufacturer of brooms. After noticing the sales of the plaintiff's products, the defendant began manufacturing brooms with a similar colored stripe in the bristles. The *Libman* plaintiff brought a trademark infringement suit against the defendant that the district court granted. However, the Seventh Circuit reversed on appeal finding that there was no likelihood of confusion. *See id.* at 1364. The Seventh Circuit posited two distinct theories of confusion, the first being confusion at the point of sale and the second being post sale confusion. In reversing the district court's opinion, the Seventh Circuit found that the evidence in the record did not support the first theory and that the plaintiff and the district court failed to argue and consider the second. *See id.* at 1362–63.

In rejecting the plaintiff's point of sale confusion arguments, the Seventh Circuit noted that the products were sold with wrappers that completely covered the bristles, negating the usefulness of the colored stripe as a trademark and that there was no evidence in the record that these wrappers were ever removed prior to a sale. *See id.* at 1362. Keystone and Mid–states' products, on the other hand, are sold with paper labels that are small in proportion to the products and do not obscure or cover the relevant colored portions. Furthermore, the plaintiff in *Libman* failed to present any evidence of bad faith, *see id.*, or any evidence of actual confusion or survey data attesting to the likelihood of confusion. *See id.* at 1364. However, the preceding evidence is present in this case, rendering *Libman* factually inapposite to the case at hand.

### II. Balancing of Harm

■ In order to succeed on a motion for preliminary injunction, a plaintiff must prove that it has an inadequate remedy at law and that it would suffer irreparable harm if a preliminary injunction does not issue. *See Ty, Inc. v. The Jones Group, Inc.*, 98 F.Supp.2d at 991 (citing *Ty, Inc. v. West Highland Publishing, Inc.*, 1998 WL 698922 at *19 (N.D.Ill.1998)). "These two elements are often merged because they involve the same analysis." *Ty, Inc. v. The Jones Group, Inc.*, 98 F.Supp.2d at 991; *Meridian Mut. Ins. Co.*, 128 F.3d at 1120. Irreparable harm is generally presumed in cases of trademark infringement and trademark dilution. *See Eli Lilly*, 233 F.3d at 469; *see also Abbott Labs.*, 971 F.2d at 16 (regarding the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss"); *American Dairy Queen Corp. v. New Line Prod., Inc.*, 35 F.Supp.2d 727, 729 (D.Minn.1998) (presuming irreparable harm by dilution). Additionally, it has been recognized that such irreparable harm is "not susceptible to adequate mea-

surement for remedy at law ....” *See International Kennel Club,* 846 F.2d at 1092. Keystone has also alleged irreparable injury to their business reputation through association of Defendants' products with its name. Courts have held that this is sufficient to establish irreparable injury. *See Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) (“the damage to the goodwill and prominence of the (plaintiff's) trademark through public confusion of it with (defendant's) trademark is, in itself, an irreparable injury.”).

■ Mid–states sole defense to irreparable harm is its claim that Keystone waited seven months from the time it became aware of Mid–states' infringement to the time it filed the instant motion for a preliminary injunction. In light of this delay, Mid–states contends that there is no irreparable harm. However, “delay is only one among several factors to be considered; [the] cases do not support a general rule that irreparable injury cannot exist if a plaintiff delays in filing its motion for a preliminary injunction.” *Ty, Inc. v. The Jones Group, Inc.,* 98 F.Supp.2d at 992 (citing *Ideal Industries, Inc.,* 612 F.2d at 1018). Mid–states must have been “lulled into a false sense of security or ... acted in reliance on the plaintiff's delay.” *Ty, Inc. v. The Jones Group, Inc.,* 98 F.Supp.2d at 992. Keystone's delay in filing the instant motion for preliminary injunction cannot be taken as a surrender by Keystone to its trademark rights. To the contrary, Keystone's issuance of a cease and desist notice should have placed Mid–states on notice that it could be subjected to a trademark infringement suit and a preliminary injunction. Denying Keystone a preliminary injunction would subject Keystone to suffer irreparable damage to the goodwill and prominence of its marks and suffer incalculable monetary harm.

■ Having concluded that Keystone will suffer irreparable harm if the preliminary injunction is not granted, the Court must proceed to balance Keystone's harm to the harm Mid–states will suffer if the preliminary injunction is granted. Richards testified that Oklahoma Steel and Wire ceased production of the green colored wire in May, 2002. Mid–states has ceased the use of the “Ranch King” mark in favor of the “Ranch Premium” mark, as well. In short, the only harm Mid–states will face is in selling off its remaining stocks of green wire fencing. While that may be the case, “ ‘[o]ne entering a field already occupied by another has a duty to select a mark that will avoid confusion,’ one who fails in this duty cannot later ‘complain that having to mend its ways will be too expensive.’ ” *Ty, Inc. v. The Jones Group, Inc.,* 98 F.Supp.2d at 993 (citing *Processed Plastic Co.,* 675 F.2d at 859) (internal citations omitted). It is therefore clear to the Court that the balancing of equities weighs substantially in favor of Keystone.

## III. Public Interest

The Supreme Court has stated that “because trademarks desireably promote competition and the maintenance of product of product quality, Congress determined that a sound public policy requires that trademarks should receive nationally the greatest protection they can be given.” *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Accordingly, this factor also weighs in favor of granting a preliminary injunction.

## CONCLUSION

Keystone has shown that it has a better than negligible chance of succeeding on the merits of its trademark infringement claim. In addition, Keystone has demon-

strated that it will suffer irreparable harm if the injunction is not granted, there is no adequate remedy at law, and that it and the public will suffer greater harm if the preliminary injunction is not granted.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Preliminary Injunction [Doc. # 9] is GRANTED. Accordingly, it is hereby ORDERED:

1. That Defendants Mid–states Distributing Company, Inc., Blain Supply, Inc. and Oklahoma Steel & Wire, Inc., and all directors, officers, agents, servants, employees, attorneys and all persons and entities in active concert or participation therewith, including, but not limited to, manufacturers, distributors, retailers and cooperative members, are immediately enjoined from:

 a. using, displaying, promoting, advertising, selling or offering to sell (1) wire fence in which the top wire is colored green, (2) barbed wire containing barbs colored green, or (3) products bearing any mark confusingly similar to Keystone's red-top or red-barb trademarks;

 b. using, displaying, promoting, advertising, selling or offering to sell wire fence or barbed wire under the marks "Ranch King," "King Ranch," or any other mark confusingly similar thereto; and

 c. using, displaying, promoting, advertising, selling or offering to sell products under any mark that are likely to dilute Keystone's marks, namely (i) "King Ranch," (ii) a top wire colored red in wire fencing, or (iii) barbs colored red in barbed wire, unless licensed by Keystone.

2. That Defendants and their agents and affiliates file with this Court and serve upon Keystone within ten (10) days after service of this Order, a written report under oath, setting forth in detail the manner of compliance with this Order.

3. That within ten (10) days of entry of this Order, Keystone shall post security in the amount of $25,000.00 for the payment of such costs and damages as may be incurred and suffered by any party found to have been wrongly enjoined.